IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 29, 2005

## STATE OF TENNESSEE v. VINCENT A. HESTER

**Appeal from the Criminal Court for Roane County**
**No. 12864A     E. Eugene Eblen, Judge**

_____

**No. E2005-00003-CCA-R3-CD - Filed December 28, 2005**

_____

A Roane County Criminal Court jury convicted the defendant, Vincent A. Hester, of attempted first degree murder, a Class A felony, and felony reckless endangerment, a Class E felony, and the trial court sentenced him to twenty years for the attempted murder and two years for the reckless endangerment to be served concurrently in the Department of Correction. The defendant appeals, claiming that the evidence is insufficient and that the trial court failed to perform its duty as the thirteenth juror pursuant to Rule 33(f) of the Tennessee Rules of Criminal Procedure. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Spence R. Bruner, Kingston, Tennessee, for the appellant, Vincent A. Hester.

Paul G. Summers, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; J. Scott McCluen, District Attorney General; and Daryl Roger Delp, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's shooting Sterling Cooper at the Roane County Community Center ("Community Center") on January 27, 2003. At the trial, Tiffany Harris testified that she was at the Community Center on the night of the shooting. She said she was sitting in the bleachers with Jamie Smith, April Bingham, and Devin Bertram watching her brother play basketball. She said fifteen to twenty people were playing basketball in the gymnasium when she saw the victim enter about 7:00 p.m and begin playing a game of basketball. She said that shortly thereafter, she saw the defendant and another man enter the gymnasium through a side door. She said they walked through the middle of the basketball courts and stopped to speak to someone. She said they then left the gymnasium and went upstairs before returning a few minutes later. She said

that when they returned, the defendant walked onto the court and confronted the victim, asking him "how are we going to do this" and showing him a handgun.

Ms. Harris said that when the defendant produced his gun, the victim stepped away from him and began running. She said the victim did not threaten or attack the defendant. She said the defendant ran after the victim, shooting at the victim and chasing him up the stairs. She said the person accompanying the defendant left the gymnasium before the shooting began. She said the defendant shot three times while chasing the victim and then returned to the gymnasium, waving his gun in the air and asking "if anybody else wanted some more." She said the defendant ran out of the Community Center. Ms. Harris identified the defendant as the man who shot the victim.

On cross-examination, Ms. Harris admitted that she did not think it was suspicious that the defendant and the other man were wearing hooded jackets when they entered the gymnasium because it was cold outside. She acknowledged that the victim did not speak to or threaten the defendant before the defendant began shooting at him. Ms. Harris admitted that although she was within a few feet of the defendant when he began shooting, she did not know the color of the gun. Ms. Harris said she did not hear four gunshots, only three. She admitted, however, that after the defendant began chasing the victim, she lost sight of them.

April Bingham testified that she was at the Community Center on the night of January 27, 2003, watching Ms. Harris's brother play basketball when she noticed the defendant enter the gymnasium through the side door. She said that the defendant was wearing a black jacket with a hood pulled over his head and that the defendant had his hands in his pockets. She said the defendant came over to the bleachers near where she and Ms. Harris were seated and spoke to someone. She said the defendant then left the gymnasium and went upstairs. She said that when the defendant returned, he walked onto the basketball court still wearing his jacket and confronted the victim. She said the defendant said something to the victim and showed the victim his gun. She said that the victim fled and that the defendant chased after him, shooting. She said the victim did not speak to or threaten the defendant before the defendant began shooting him. She said that when the shooting began, she ran away and that everyone in the gymnasium was running away. She said that during the shooting, the defendant had the hood from his jacket over his head. She said the defendant fled out the side door of the gymnasium after shooting the victim. She said that before fleeing, the defendant asked, "[D]oes anybody else want any?" She said she did not know the defendant.

On cross-examination, Ms. Bingham acknowledged that when the defendant entered the gymnasium and spoke to someone by the bleachers, he did not appear upset. She admitted she did not notice the victim or anyone else reacting negatively to the defendant's presence in the gymnasium. She admitted she did not know where the defendant and victim were in the gymnasium when the defendant began shooting. She admitted that she did not know if the victim was facing the defendant when the shooting began. She acknowledged that after the shooting, many of the eyewitnesses were gathered in one room waiting to give statements to the police and that everyone in the room was talking about the shooting.

James Smith testified that he went to the Community Center on the night of January 27, 2003, in order to play basketball. He said he regularly played and coached basketball at the Community Center. He said that he knew the victim from playing basketball with him but that he did not know the defendant. He said that he was sitting on the bleachers when the defendant arrived. He said that the defendant was wearing pants and a jacket, that he did not appear dressed to play basketball, and that he did not have a gym bag with him. He said the defendant walked onto the court and began asking questions. He said he did not see a handgun until the shooting began. He said the gun was a large caliber automatic. He said that after the shooting began, he ran outside. He said, however, that he was able to see the defendant inside the gymnasium before the defendant fled, waving his gun in the air and threatening the witnesses. He said that he did not know how many shots were fired but that more than one shot was fired. On cross-examination, Mr. Smith admitted that he was unaware of the presence of a gun until he heard gunshots.

Devin Bertram testified that he was at the Community Center on January 27, 2003, waiting to play basketball when he saw the defendant, whom he did not know, enter the gymnasium accompanied by a friend. He said that when the defendant walked across the basketball court after entering the gymnasium through the side door, the defendant spoke to him. He said that the defendant asked him where Rashad was and that he replied that he did not know. He said the defendant and his friend then went upstairs. He said that when the defendant returned, the defendant asked if Eric Gallaher, who was playing basketball, was the person who had robbed him. He said both he and Mr. Gallaher's friend replied that Mr. Gallaher did not rob the defendant. He said the defendant and his friend acted like they were leaving but stopped to talk to the victim. He said the defendant asked the victim something and the victim responded. He said that at that point, someone yelled "he's got a gun" and that everyone began running. He said that when the defendant pulled out his gun, he pointed it at the victim and began shooting as the victim ran away. He said the defendant's gun was "a black .45." He said he heard five gunshots. He said the gunshots frightened everyone in the gymnasium, including children as young as eight years old.

Mr. Bertram testified that after the defendant left, he went upstairs and found the victim, who had been shot. He said the victim had been shot in the arm and the legs and was bleeding profusely. He said a helicopter arrived and transported the victim to the hospital.

On cross-examination, Mr. Bertram acknowledged that although he had never seen the defendant before the night of the shooting, he did know the defendant's friend. Mr. Bertram maintained that the defendant pulled his gun out before the victim began running. Mr. Bertram admitted that when the defendant and his friend entered the gymnasium, they saw the victim playing basketball but did not confront him. Mr. Bertram said that when the shooting began, the defendant's friend ran outside. Mr. Bertram admitted that although the police had told everyone not to leave, he left and went to the hospital because the victim is his cousin. Mr. Bertram said his reason for leaving was not because he was afraid of the police searching him for the presence of weapons. He said that other than the defendant, no one else at the Community Center had a gun.

Eric Gallaher testified that he was at the Community Center on January 27, 2003, just finishing playing basketball when he noticed the defendant enter the gymnasium. He said that he had never seen the defendant in Roane County before but that he had seen him at a night club in Knoxville. In all other respects, Mr. Gallaher's testimony was cumulative to that of the preceding witnesses.

Harriman Police Department Detective Randy Heidle testified that he was assigned to investigate the shooting at the Community Center. He said that when he arrived at the Community Center, other officers of the Harriman Police Department had already secured the crime scene. He said most of the witnesses were still at the scene. He said he was able to learn from the witnesses the nicknames of the defendant and his friend: "Dirty" and "Slim." He said he categorized the physical evidence and took pictures of the scene. He said that during the investigation, he learned the defendant was from Nashville. He said the defendant telephoned the police department and arranged "to turn himself in as the shooter at the community center."

On cross-examination, Detective Heidle testified that witnesses told him that someone named Nicholas Eskridge was present at the Community Center on the night of the shooting. He admitted he did not interview Mr. Eskridge but explained he failed to do so because Mr. Eskridge did not want to give a statement. Detective Heidle acknowledged that he would have questioned anyone who was found to have had a weapon at the crime scene. He admitted he did not find any duffel bags in the gymnasium but said he found a jacket in the office. He admitted he did not find any evidence that more than four shots were fired.

The victim, Sterling Cooper, testified that he was playing basketball at the Community Center on the night of the shooting. He said he saw the defendant when the defendant came onto the basketball court. The victim said he looked at the defendant and knew the defendant was going to shoot him because of the look in the defendant's eyes. He said someone yelled that the defendant had a gun, that he began to run, and that the defendant began shooting. The victim said that he ran upstairs and that the defendant ran after him, shooting. The victim said he did not realize at first that he had been struck by a bullet but soon discovered that he had been shot in his hand, both legs, and back.

The victim said he had never seen the defendant before the shooting. He said he did not attempt to hit the defendant before the shooting. He indicated that when the defendant was shooting him, there were children near his escape path.

On cross-examination, the victim admitted that he had seen the defendant's friend before but maintained that he had never had an argument with him. He admitted, however, that the defendant's friend told him that the friend's uncle was upset with him. The victim admitted that after this conversation with the defendant's friend, he "beat up" the uncle, Reginald Moss, at the house of a mutual friend. The victim said Reginald Moss had a "personal vendetta" against him.

The defendant testified that although he lived in Nashville, he had friends in Roane County. He said he was in Roane County on January 27, 2003, visiting his friend, Jerry Stewart. He said he and another friend were returning from eating at a restaurant when they encountered the victim. He said that he asked the victim if he knew where Mr. Stewart was and that the victim became upset and brandished a gun, causing them to leave. He said the friend with him gave him a gun and said, "I ain't f****** with Dude and them." The defendant said he then met Mr. Stewart and they went to the Community Center to play basketball. The defendant said that when they arrived, he saw the victim on the court but that he paid him no attention. He said that because there were other players waiting, he and Mr. Stewart went upstairs and talked to some other people before returning to the gymnasium.

The defendant testified that when he and Mr. Stewart reentered the gymnasium, Mr. Stewart asked Mr. Bertram where someone named Rashad Siler was. The defendant said Mr. Stewart was looking to find Mr. Siler in order to fight him. The defendant said Mr. Siler was not in the gymnasium. The defendant said that he and Mr. Stewart decided to leave and that as they were leaving, the victim said to him, "[B]itch, I'll kill you." The defendant said that he took the victim's statement as a threat, that the victim began retreating toward the bleachers, and that he thought the victim was going for a gun in his jacket. The defendant said that because he was afraid, he "pulled the gun out, and fired four shots rapidly." He said he was not trying to kill the victim so he aimed low. The defendant said he did not know if any bullets had struck the victim. He said he left the gymnasium and returned to Nashville. He said that after he found out that the victim had been shot, he turned himself in to the police.

Based upon this evidence, the jury convicted the defendant. The defendant filed a motion for new trial which the trial court denied. The court found that "no ground exist[ed] which would justify the Court to grant the defendant a new trial," and it "approve[d] the verdict of the Jury."

On appeal, the defendant contends that the trial court did not properly review the evidence introduced at the trial or approve the verdict pursuant to Rule 33(f) of the Tennessee Rules of Criminal Procedure. He also claims the evidence is insufficient because the state introduced no proof of his intent to kill the victim. The state responds that the trial court properly exercised its authority under Rule 33(f) and that the evidence is sufficient. We agree with the state.

## I. THIRTEENTH JUROR RULE

Rule 33(f) provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has held that "Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995).

The record reflects that in denying the defendant's motion for new trial, the trial court specifically "approve[d] the verdict of the Jury." This issue is without merit.

## II. SUFFICIENCY OF THE EVIDENCE

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation is formed "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). In Bland, the court concluded that "the use of a deadly weapon upon an unarmed victim" is a factor that can be used to infer premeditation. 958 S.W.2d at 660. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). Felony reckless endangerment occurs when a person using a deadly weapon "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103.

At the trial, various witnesses testified that they were in the gymnasium watching basketball when the defendant and Mr. Stewart entered. The witnesses testified that after going upstairs for a brief period, the defendant reentered the gymnasium, went onto the floor, confronted the victim, displayed a gun, and began shooting the unarmed victim. The record reflects that children were present in the gymnasium near the victim while the defendant was shooting. The victim testified that he was struck in four parts of his body with bullets, that he did not know the defendant before the shooting, and that he did not assault or threaten the defendant before the shooting. The defendant testified that the victim threatened him earlier that evening by brandishing a weapon when he asked the victim where Mr. Stewart was. He said that when he went to leave the gymnasium, the victim threatened to kill him. He said he only shot the victim because he thought the victim was going to retrieve his gun. We conclude that a rational juror could have found the defendant guilty beyond a reasonable doubt of attempted first degree murder and felony reckless endangerment. The defendant is not entitled to relief.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE